## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MCKINLEY PHIPPS** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO: 06-0570** |
| **TIM WILKINSON, WARDEN** | * | **SECTION: "T"(6)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2).  Accordingly, it is recommended that the petition for habeas corpus relief filed on behalf of McKinley Phipps be **DENIED WITH PREJUDICE.**

# I.  PROCEDURAL HISTORY[1]

Petitioner, McKinley Phipps, a prisoner incarcerated in Winn Correctional Center, was charged by bill of indictment with second degree murder, in violation of LSA-R.S. 14:30.1, and entered a plea of not guilty.  Shortly after trial proceedings commenced, petitioner moved for a mistrial based upon the assistant district attorney's references, in his opening statement, to petitioner's alleged attempts to intimidate witnesses.  The trial court granted the mistrial and the State filed an application to the Louisiana First Circuit Court of Appeal for supervisory writs, seeking review of the trial court's ruling granting a mistrial.  The state appellate court granted the State's writ application, *State v. Phipps*, No. 2001 KW 2171 (La. App. 1 Cir. Sept. 14, 2001) (unpublished),[2] determining that the trial court erred in its ruling that the assistant district attorney's remarks constituted grounds for a mistrial.  Thereafter, following trial by jury, petitioner was found to be guilty of the responsive offense of manslaughter, in violation of LSA-R.S. 14:31.  Petitioner was sentenced to 30 years imprisonment at hard labor.[3]

---

[1]The court's recitation of petitioner's procedural history is taken from the unpublished opinion of the Louisiana First Circuit Court of Appeal, State v. Phipps, No. 2002 KA 0890 (La. App 1 Cir. Dec. 20, 2002), a copy of which is contained in the State rec., vol. 6 of 6, along with this court's review of the pertinent record.

[2]A copy of the Louisiana First Circuit's Order granting the State's writ application is contained in the State rec., vol. 1 of 6, p. 215.

[3]A copy of petitioner's December 21, 2001 sentencing transcript is contained in the State rec., vol.  5 of 6, pp. 1048-1072.

On December 20, 2002, pursuant to his appeal, the Louisiana First Circuit Court of Appeal affirmed petitioner's conviction and sentence.  *See State v. Phipps*, No. 2002 KA 0890 (La. App. 1 Cir. Dec. 20, 2002) (unpublished opinion).  On December 12, 2003, the Louisiana Supreme Court denied petitioner's writ application.  *See State v. Phipps*, 860 So.2d 1148 (La. 2003).

Following the completion of his direct appeal proceedings, petitioner sought post-conviction relief.  His efforts in this regard culminated on January 27, 2006, when the Louisiana Supreme Court denied his writ application.  *See State v. Phipps*, 922 So.2d 546 (La. 2006).

Petitioner filed the instant action for federal habeas corpus relief on or about February 6, 2006.  Petitioner claims that his constitutional rights were violated by virtue of the following:  1) The introduction of evidence and/or argument regarding his alleged involvement in a conspiracy to cover-up the crime at issue, his alleged attempts to intimidate witnesses, his possession of firearms which were not involved in the pertinent shooting, and his stage name and song lyrics;[4] 2) the admission of hearsay evidence; 3) the State's "vouching for the credibility of a trial witness" and "testifying to [petitioner's] guilt"; 4) the denial of his right to effective assistance of counsel; and, 5) the fact that the prosecution was

---

[4]The above delineated arguments, encompassed under claim 1), are set forth in petitioner's supporting memorandum as "Assignment of Error I" and "Assignment of Error III".  *See* Federal rec., doc. 1, petitioner's "Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to Title 28  U.S.C. Section 2254", pp. 6-14 and pp. 19-25.

3

allowed to back strike a juror that had already been sworn.  The State, in its response (rec. doc. 9, p. 2), concedes that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982), and does not contest that the instant action has been timely filed.  Accordingly, this court shall review the pertinent facts, then proceed to address the merits of petitioner's claims.

## II.  FACTS[5]

Petitioner, McKinley Phipps, a rap performer known as "Mac the Camouflage Assasin", was scheduled to perform on the evening of February 20, 2000, at Club Mercedes in St. Tammany Parish.  Petitioner, along with his mother and father, was at the club when someone hit Desmond Cousin on the head with an unidentified object, causing Cousin to fall to the floor.  Once on the floor, people began to kick Cousin.  The victim, Barron Victor, Jr., pushed his way through the crowd and stood over Cousin, attempting to protect him.  Victor was then shot once, in the left shoulder, and died shortly thereafter.

Victor's cousin, Nathaniel Tillison, identified petitioner as the shooter.  Tillison stated that petitioner's gun was only "a couple of inches" away from the victim when the shot was fired.[6]  Tillison further stated that he had "no doubt" that petitioner was the shooter,

---

[5]The facts are taken from the state appellate court's opinion on direct appeal, *State v. Phipps*, No. 2002 KA 0980 (La. App. 1 Cir. Dec. 20 2002) (unpublished opinion), along with this court's review of the trial transcript.

[6]*See* State rec., vol. 3 of 6, p. 630, lines 25-30.

explaining that he "looked dead in [petitioner's] eyes" when petitioner shot the victim.[7] Shortly after the shooting, Tillison was interviewed by police officials and identified petitioner's photograph from a 24-picture photographic lineup as the person who had shot his cousin, Barron Victor, Jr.[8]

Another witness, Yulon James, gave a statement to police and testified at trial that she saw petitioner holding a gun with sparks coming out of the gun at the time of the murder.[9]  At the time of the shooting, James was dating Duane Henderson, who worked as a promoter for petitioner's rap performances.  James identified petitioner at trial and, prior to trial, in the 24-picture photographic lineup.  James also testified that petitioner, after she provided a statement to police, placed collect calls to her home.  She stated that the calls continued even after her home telephone number was changed.  Though she never actually spoke with petitioner, James stated that receiving the calls made her nervous.[10]

During the police investigation of Barron Victor's murder, three witnesses provided statements to the effect that they saw someone other than petitioner shoot the victim.  They did not, however, identify the shooter nor did they testify at trial.  Additionally,

---

[7]*See* State rec., vol. 3 of 6, p. 630, lines 22-24 and lines 31-32.

[8]*See*  State rec., vol. 3 of 6, p. 636, lines 28-32; pp. 637-638; p. 639, lines 1-13.

[9]*See* State rec., vol. 4 of 6, p. 803, lines 24-32; p. 804, lines 1-9.

[10]*See* State rec., vol. 4 of 6, p. 808, lines 30-32; p. 809, lines 1-9; p. 811, lines 13-32;  p. 812, lines 1-17.

Thomas Williams, whose fiancee was petitioner's aunt, provided police with a statement a few days after the shooting took place, informing that he had shot the victim, but that he had done so in self-defense.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2001, 149 L.Ed.2d 1004 (2001).  The United States Supreme Court has advised that:

Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Hill*,

210 F.3d at 485.  Questions of fact found by the state court are "presumed to be correct ... and

we will give deference to the state court's decision unless it `was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.'"

*Hill*, 210 F.3d at 485, *quoting* 28 U.S.C.§ 2254(d)(2).

## IV.  ANALYSIS

### A.  Introduction of Evidence and/or Argument Regarding Petitioner's Alleged Involvement in Conspiracy to Cover-Up Crime, Alleged Attempts to Intimidate Witnesses, Possession of Firearms Not Involved in Shooting, and Stage Name and Song Lyrics

Petitioner argues that evidence and argument regarding other bad acts or other

crimes were improperly admitted, without prior notice being provided, as required under

Federal Rule of Evidence 404(b).  According to petitioner, the State, during its closing

argument, improperly inferred that petitioner had entered into a scheme with Thomas

Williams pursuant to which Williams would fabricate a story that he had killed the victim in

self-defense, thereby getting petitioner "off the hook" for the murder.  A review of the trial

transcript reflects the following colloquy during the prosecution's closing argument:

> MR. DEARING (Assistant District Attorney):
> What about Thomas Williams?  Well, let's examine his account and see
> if it is believable.  First of all, let's not forget the fact that his fiancee or wife,
> I have heard it described both ways, is an aunt of the defendant's.  And second
> of all, he didn't come in and take a murder rap.  He came in and claimed self-
> defense, which means that everybody walks.

MR. WILLIAMS (Defense Counsel):
    Objection, Judge.

THE COURT:
    Overruled.

MR. DEARING:
    They came up with a plan after McKinley Phipps is arrested for this murder.  That's the only time - -

MR. WILLIAMS:
    No evidence, Judge, objection.  Nothing was presented to that....

THE COURT:
    Overruled.  Proceed....

MR. DEARING:
    It wasn't until McKinley Phipps is in custody in jail on these murder charges that Thomas - - that the identity of Thomas Williams surfaced.  After McKinley Phipps is arrested, then the plan is set in motion to have Thomas Williams come in and again, and not take the rap for murder because that would take a lot of guts for somebody to do if they hadn't done it.  But he didn't take the rap.  He came in and said I have killed in self-defense and even said at some point during the tape that he was looking forward to going home and taking a bath at the end of that statement, because he had been convinced that you go in and say self-defense and not only does it spring McKinley Phipps out of jail, but you get to go home too, because self-defense is a valid defense to killing someone....[11]


    Petitioner next points to the State's opening argument, along with the direct

testimony of witness, Yulon James, claiming that improper remarks were made and evidence

---

[11]*See* State rec., vol. 4 of 6, p. 965, lines 30-32; p. 966, lines 1-16; p. 967, lines 17-32; p. 968, lines 1-6.

was elicited regarding petitioner's alleged intimidation of witnesses.  Specifically, petitioner

complains about the following opening remarks on the part of the assistant district attorney:

> Through influence and intimidation he [petitioner] has sought to hide the fact that he committed murder.[12]

> [People] have seen this man's influence.  They have seen his intimidation.[13]

> You will see that this man has used his image, his influence, and his intimidation to conceal his murder or to attempt to conceal his murder.[14]

> [A]ll of a sudden, these people [witnesses], a large number of them, became uncooperative when approached by police stating they were scared.[15]

With regard to the direct examination of witness, Yulon James, petitioner complains that

testimony regarding his collect telephone calls to James's home, along with her reaction to

these calls, should not have been admitted.  A review of the pertinent trial transcript reflects

the following testimony from James:

> Q.  Now after you gave your statement to the police, did you have any contact with the defendant?

---

[12]*See* State rec., vol. 1 of 6, p. 157, lines 15-17; *see also* petitioner's supporting memorandum at p. 8.

[13]*See* State rec., vol. 1 of 6, p. 158, lines 28-30; *see also* petitioner's supporting memorandum at p. 8.

[14]*See* State rec., vol. 2 of 6, p. 444, lines 11-14; *see also* petitioner's supporting memorandum at p. 8.

[15]*See* State rec., vol. 2 of 6, p. 449, lines 2-5; *see also* petitioner's supporting memorandum at p. 8.

9

A.  Um, I didn't speak to him per se, but he would have called for Duane [James's boyfriend and petitioner's promoter]....

Q.  [W]hen you state that they were from the defendant, why do you say that?

A.  Because they would come in from Covington and it would say collect call from Mac, will you accept the charges.

Q.  Collect call from whom?

A.  Mac.

Q.  Do you know anybody other than the defendant - -

A.  No.

Q.  That goes by the name of Mac.  The first time that that happened, did you accept that call?

A.  No....

Q.  Did you take any steps in response to the defendant's attempt to reach you by phone?

A.  We got the number changed.

Q.  And after you changed your phone number, did that incident happen again?

A.  Yes....

Q.  How did that make you feel?

A.  I was scared.[16]

---

[16]*See* State rec., vol. 4 of 6, p. 808, lines 30-32; p. 809, line 1; p. 811, lines 15-26; p. 812, lines 4-9 and lines 16-17.

Petitioner complains that more evidence of improper actions came to the jury's attention via the improper admission of evidence and argument regarding petitioner's possession of numerous guns, none of which were used to kill the victim, Barron Victor, Jr. As the Louisiana First Circuit acknowledged in addressing this matter on direct appeal, the trial court allowed the State to introduce evidence to the effect that "one AK-47, one 9mm handgun and two 38-caliber handguns [were] seized at defendant's residence" and "one AK-47 [was] found in defendant's vehicle." "The State also introduced into evidence a 9mm magazine which was found in defendant's vehicle, but did not match the 9mm handgun seized. Additionally, the State introduced into evidence a gun case for a 38-caliber handgun. The case did not match either of the 38-caliber handguns seized."[17]

Finally, in connection with his claims regarding the admission of improper evidence and argument, petitioner complains about numerous references made by the State to his song lyrics and stage name. Petitioner states, and a review of the trial transcript reflects, that the assistant district attorney, during opening and closing arguments, repeatedly referred to petitioner's "musical alias - Mac the Camouflage Assassin". Further, the assistant district attorney, in opening and closing arguments, referred to lyrics such as: "Murder, murder, kill, kill. Pull the trigger, put a bullet in your head."[18] Additionally, in questioning

---

[17]*See State v. Phipps*, No. 2002 KA 0890 at p. 11.

[18]*See* State rec., vol. 2 of 6, p. 443, line 32; p. 444, line 1; *see also* petitioner's supporting memorandum at pp. 20-22.

11

petitioner's father, McKinley Phipps, Sr., in connection with his testimony regarding the military influence reflected in petitioner's songs, the assistant district attorney referred to the lyric: "So if you F with me you get a bullet - -".[19]

It is well established that federal habeas review is limited to questions of constitutional dimension. *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998). In reviewing state court evidentiary rulings, such as the ones set forth above pursuant to which argument and evidence of prior bad acts were brought before the jury and notice of the State's intent to bring forth this argument and evidence was not provided, the federal habeas court's role "'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness.'" *Andrade v. McCotter,* 805 F.2d 1190, 1193 (5th Cir. 1986), *quoting Mattheson v. King,* 751 F.2d 1432, 1445 (5th Cir.1985). "[T]he erroneous admission of prejudicial testimony justifies habeas corpus relief only when it is "material in the sense of [being a] crucial, critical, highly significant factor." *Id.* (quotations omitted).

In the instant matter, given the strong evidence submitted against petitioner, in particular, the strong eyewitness testimony of Nathaniel Tillison, the court finds that the

---

[19]*See* State rec., vol. 4 of 6, p. 752, line 19; *see also* petitioner's memorandum at p. 20.

alleged evidentiary errors described by petitioner did not constitute a denial of fundamental fairness. A review of the trial transcript reflects that Tillison, who, at the time of the shooting, was close enough to petitioner to look into his eyes, unequivocally identified petitioner as the shooter. Specifically, Tillison stated that he had no doubt that petitioner was the person who he saw shoot Barron Victor.[20]

Additionally, in addressing petitioner's complaints regarding the prosecution's efforts, in opening and closing remarks, to present petitioner as a bad person by, for example, informing jurors of his stage name, quoting lyrics from his songs, and insinuating that he tried to cover up his involvement in the murder and intimidate witnesses, the Louisiana First Circuit noted that jurors were informed that counsel's statements in opening and closing arguments did not constitute evidence to be considered in adjudicating the matter. Specifically, the state appellate court quoted the following instructions provided by the trial court to jurors:

> You must determine the facts only from the evidence presented. The evidence which you should consider consists of the testimony of witnesses and exhibits such as writings and physical objects which I have permitted the parties to introduce.... Statements and arguments made by the attorneys are not evidence. In the opening statements, the attorneys were permitted to familiarize you with the facts they expected to prove. In closing arguments, the attorneys were permitted to present for your consideration their contentions regarding what the evidence has shown or not shown and what conclusions they think may be drawn from the evidence. **The opening statements and the**

---

[20]*See* State rec., vol. 3 of 6, p. 630, lines 22-32.

**closing arguments are not to be considered as evidence**.   [Emphasis added.][21]

With regard to evidence of alleged witness intimidation via the prosecution's questioning of Yulon James and "bad character" evidence elicited via the prosecution's questioning of McKinley Phipps, Sr., the Louisiana First circuit noted that petitioner had the opportunity, via cross-examination of these witnesses and via his own direct examination, to counter this disparaging evidence.[22]   Further, the state appellate court noted that the insinuation that petitioner was attempting, via his collect telephone calls, to intimidate James, was countered when it was established, on cross-examination, that James's boyfriend at the time worked for petitioner; "[t]hus, the jury was aware that there was another possible explanation for the telephone calls to James's home."[23]

Finally, the Louisiana First Circuit Court of Appeal noted, with respect to the alleged improper admission of evidence regarding petitioner's possession of guns, ammunition and a gun case, that the negative connotation which petitioner associated with this evidence was countered by the fact that the State did not suggest that petitioner, by virtue of his possession of these items, had violated any law and the possession of guns, in

---

[21]*See State v. Phipps*, No. 2002 KA 0890 at p. 9.

[22]*See State v. Phipps*, No. 2002 KA 0890 at pp. 6 and 8.

[23]*See State v. Phipps*, No. 2002 KA 0890 at p. 6.

Louisiana, "is not illegal or immoral."[24]   Further, the state appellate court reasoned that evidence of petitioner's possession of "various guns", along with "the unmatched 9 mm magazine and the unmatched 38-calliber gun case", was probative given the fact that the "murder weapon was never found" and petitioner "had approximately three hours in which he could have disposed of the murder weapon".[25]

Accordingly, based upon the strong case against petitioner, along with the above-quoted jury instructions, the availability of cross-examination, and the lack of any crime or immorality associated with petitioner's gun possession, along with the probative value of such evidence, the court finds that any evidentiary errors committed by the trial court in the admission of the above-described argument and evidence did not constitute a due process violation.  Thus, petitioner's claim for federal habeas corpus relief is without merit.

### B.  Admission of Hearsay Evidence

As the Louisiana First Circuit noted on direct appeal and as a review of the trial transcript confirms, St. Tammany Parish Sheriff officials, specifically, Deputies Kevin Nelson and Patrick McCormick, arrived at Club Mercedes "within minutes of the shooting".[26]  Both officers testified that upon their arrival, they saw "many excited people

---

[24]*See State v. Phipps*, No. 2002 KA 0890 at p. 12.

[25]*See State v. Phipps*, No. 2002 KA 0890 at p. 12.

[26]*See State v. Phipps*, No. 2002 KA 0890 at p. 9.  Deputy Nelson estimated that they arrived at the club within four minutes of receiving notification that a shooting had occurred (*see* State rec.,

... exiting the club in a chaotic fashion."[27]  Officer McCormick testified that "[p]eople were running out of the building screaming."[28]  McCormick informed that as the patrons were fleeing, he heard the exclamation:  "[W]hy did Mac do this".  He heard other fleeing patrons yelling:  "Mac the Assassin, Mac the Camouflage Assassin".  Another patron pointed to a Mac the Camouflage Assassin poster, indicating that he was the shooter.[29]  Similarly, Officer Nelson stated that he witnessed "[v]ery excited, very panicky" people exiting the club, stating: "[T]he shooter is inside ... Mac the Camouflage Assassin Raper".[30]  Yulon James likewise testified that as soon as "the shots went off, everybody started screaming Mac shot him, Mac shot him."[31]  The trial court admitted the above-described hearsay testimony under the "[e]xcited utterance" hearsay exception enunciated in Louisiana Code of Evidence Article 803(2).  Specifically, Article 803(2) provides that "[a] statement relating to a startling event

---

vol. 3 of 6, p. 569, lines 3-14); Deputy McCormick estimated the response time as being less than ten minutes (*see* State rec., vol. 3 of 6, p. 588, lines 4-20).

[27]*See State v. Phipps*, No. 2002 KA 0890 at p. 9.

[28]*See* State rec., vol. 3 of 6, p. 588, lines 30-31.

[29]*See* State rec., vol. 3 of 6, p. 591, lines 21-22; p. 594, lines 4-7 and lines 9-10.

[30]*See* State rec., vol. 3 of 6, p. 570, lines 1-8 and lines 16-19.  The prosecution, in closing argument, referred to the above-described testimony of police officials, stating: "[T]hey heard numerous people identifying this individual [i.e., petitioner] ... as the perpetrator of this crime."  *See* State rec., vol. 4 of 6, p. 960, lines 25-28.

[31]*See* State rec., vol. 4 of 6, p. 808, lines 10-11.

or condition made while the declarant was under the stress of excitement caused by the event or condition" is "not excluded by the hearsay rule".

Petitioner argues that the trial court's admission of the hearsay testimony of police officials regarding the identification, by fleeing patrons, of petitioner as the shooter, and the prosecution's reference to same during closing arguments, along with Yulon James's testimony that seconds after the shooting people were screaming petitioner's name, identifying him as the shooter, constituted a violation of his Sixth Amendment right to confront the witnesses against him. In support of his claim that the admission of the above-described hearsay evidence constituted a violation of his right to confrontation under the Sixth Amendment, petitioner cites the case of *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004), wherein the Court provided that the Sixth Amendment's Confrontation Clause is violated by the admission of out-of-court "testimonial statements" unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant regarding his or her statement. Petitioner argues that because the declarants, i.e., the persons rushing from the club following the shooting screaming that petitioner was the shooter, were unavailable to be cross-examined, it does not matter whether their statements qualify as "excited utterances", the admission of the hearsay statements "was

17

illegal, and a blatant violation of *Crawford*."[32]  Based upon the following, the court finds

petitioner's argument in this regard to be without merit.

In *Davis v. Washington*, __ U.S. __, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224

(2006) (quotation and citation omitted), the Court clarified that the Confrontation Clause

strictly prohibits the admission of hearsay testimonial statements, explaining:  "Only

[testimonial] statements ... cause the declarant to be a witness within the meaning of the

Confrontation Clause.  It is the testimonial character of the statement that separates it from

other hearsay that, while subject to traditional limitations upon hearsay evidence, is not

subject to the Confrontation Clause."  The Court then explained:

> Statements are nontestimonial [and therefore, not strictly prohibited under
> the Confrontation Clause] *when made in the course of police interrogation
> under circumstances objectively indicating that the primary purpose of the
> interrogation is to enable police assistance to meet an ongoing emergency.*
> They are testimonial [and therefore, strictly prohibited under the
> Confrontation Clause] when the circumstances objectively indicate that
> there is no such ongoing emergency, and that the primary purpose of the
> interrogation is to establish or prove past events potentially relevant to later
> criminal prosecution.

*Id.* at 2273-2274 (emphasis added).

Based upon the explanation provided by the Court in *Davis*, *supra*, it is

clear that the shouted statements to police officials, along with the shouts overheard by

---

[32]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 18.

18

Yulon James, from fleeing club patrons regarding who had shot the victim, constituted nontestimonial statements.  As such, whether or not the admission of the hearsay statements was "illegal", as petitioner suggests, is an issue to be examined under the "traditional limitations upon hearsay evidence [and] is not subject to the Confrontation Clause."  *Davis*, 126 S.Ct. at 2273.

As noted above, federal courts possess only limited authority to consider state evidentiary determinations in a state prisoner's habeas proceeding.  *Andrade*, 805 F.2d at 1193; *Burgett v. Texas*, 389 U.S. 109, 113-14, 88 S.Ct. 258, 261, 19 L.Ed.2d 319 (1967).  As long as the evidentiary ruling is in accordance with state law and infringes no right protected under the Constitution, habeas relief is not warranted.  *Id.  See also Robinson v. Whitley*, 2 F.3d 562, 566 (5th Cir. 1993), *cert. denied*, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994).

In examining the pertinent issue on direct appeal, the Louisiana First Circuit Court of Appeal first examined the facts surrounding how police officials ascertained the hearsay statements which they testified to at trial.[33]  The court then examined applicable state law, noting:

> In order for a statement to be admissible under the excited utterance exception, it must be made under the influence of an event sufficiently startling so as to render the normal thought processes of the observer

---

[33]These facts are set forth *supra* at pp. 15-16.

inoperative.  Additionally, the startled person must not have had time to reflect or fabricate a story.  *State v. Hilton*, 99-1239, p. 11 (La. App. 1st Cir. 3/31/00), 764 So.2d 1027, 1034, *writ denied*, 2000-0958 (La. 3/9/01), 786 So.2d 113.  The rationale for the excited utterance exception is that the excited condition caused by a shocking event suspends the process of reflective thought necessary for conscious fabrication, and the recentness of the event minimizes the danger of faulty memory.  *State v. Yochim*, 496 So.2d 596, 599 (La. App. 1st Cir. 1986).

The most important element of an excited utterance exception is immediacy such that there is not time for reflection or fabrication.  *See State v. Henderson*, 362 So.2d 1358, 1362 (La. 1978).  The fact that the statement is made in response to an inquiry does not automatically defeat it as an exception as long as the statement is a spontaneous reaction and not the result of reflective thought.  *State v. Yochim*, 496 So.2d at 599.  The trial court has wide discretion in determining whether the declarant was, at the time of the statement, still under the influence of the exciting event.  *State v. Yochim*, 496 So.2d at 600.[34]

Applying the above law to the applicable facts, the state appellate court determined that the trial court's evidentiary ruling was not erroneous.  Specifically, the court found:  "The utterances heard by police officers within minutes of the murder at Club Mercedes were excited utterance exceptions to the hearsay rule."[35]

Clearly, the state appellate court's ruling with respect to the pertinent hearsay testimony is in accordance with applicable state law.  Further, the admission of the hearsay testimony, as noted above, did not impinge petitioner's right to confrontation

---

[34]*See State v. Phipps*, No. 2002 KA 0890 at p. 10.

[35]*See State v. Phipps*, No. 2002 KA 0890 at p. 10.

nor did it present any due process violation given the strong evidence presented against

petitioner at trial.[36]  As such, petitioner's claim for habeas corpus relief is without merit.

### C.  Vouching for Credibility of Trial Witness and Testifying as to Petitioner's Guilt

Petitioner, in connection with the instant claim, again complains about the

prosecutor's closing remarks.  Specifically, petitioner asserts that the State was in

violation of Louisiana law in favorably commenting upon the credibility of State witness,

Nathaniel Tillison, and in "testif[ying] as to the guilt of [p]etitioner, as well as the

innocence of Thomas Williams, effectively arguing that he would not bring a case unless

a person were guilty."[37]

Whether or not, in connection with petitioner's trial, a violation of state law

took place is, for federal habeas corpus purposes, inconsequential.  As noted earlier,

federal habeas review is limited to questions of constitutional dimension.  *See Jernigan*,

980 F.2d at 298; *Castillo*, 141 F.3d at 222 and 224.  In this case, given the evidence

submitted against petitioner, *see* discussion *supra* at pp. 12-13, the court finds that

petitioner, by virtue of any error committed by the trial court in allowing the prosecutor to

comment upon Tillison's credibility, petitioner's guilt, and Williams' innocence, did not

suffer a violation of his right to due process.  Further, any alleged error on the part of the

---

[36]*See* discussion *supra* at pp. 12-13.

[37]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 25.

trial court with regard to what the prosecutor was or was not allowed to comment upon during opening and closing arguments was offset by the trial court's cautionary instruction to jurors to the effect that the parties' opening and closing statements "are not to be considered as evidence."[38]   Accordingly, the instant claim for habeas corpus relief is without merit.

### D.  Ineffective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.  To prove prejudice under the *Strickland* standard, petitioner "must show that

---

[38]A full discussion of the trial court's cautionary instruction to jurors regarding opening and closing remarks is set forth *supra* at pp. 13-14.

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner argues that counsel was ineffective due to his failure to seek further review and/or raise an objection in connection with the following:  1) The trial court's admission of evidence regarding petitioner's possession of guns not used in the murder; 2) the trial court's decision to allow references, in the prosecution's arguments, to petitioner's stage name; 3) the appellate court's determination that grounds for a mistrial did not exist by virtue of references made at trial to petitioner's alleged attempts to intimidate witnesses; 4) the trial court's decision to allow the prosecution, during closing remarks, to vouch for the reliability of witness Nathaniel Tillison and comment upon petitioner's guilt; and, 5) the trial court's allowance of leading questions on the part of the prosecution.  However, petitioner's argument is without merit because he has failed to make the requisite prejudice showing given this court's finding that, as a result of the above-described evidentiary errors, he suffered no due process violation.[39]

Petitioner argues that counsel was unconstitutionally ineffective due to his failure to call, as witnesses at trial, Thomas Williams, who had informed police officials that he killed the victim in self-defense, along with James Barney, Jamie Wilson, Lourdes

---

[39]*See* discussion *supra* at pp. 12-15 and 21-22.

Ricketts and Darryl Prater, who provided statements to the effect that petitioner was not the shooter.[40]  However, the failure to call particular witnesses to offer testimony at trial is not per se prejudicial to the point of warranting habeas relief.  *See generally Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("complaints of uncalled witnesses are not favored, [in federal habeas review] because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative").  In *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985), the Fifth Circuit noted that for a petitioner to show prejudice under *Strickland*, he must show that the testimony of the witnesses would have been favorable and that the witnesses would have testified at trial.   Petitioner must show a reasonable probability that the uncalled witnesses would have made a difference in the result.  *Alexander*, 775 F.2d at 603.  There is a strong presumption that the failure of petitioner's counsel to call witnesses is a strategic choice.  *Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66.  Such a presumption is bolstered in the instant matter given the fact that the statements of these witnesses were part of the evidence introduced at trial.  In its direct appeal opinion, the Louisiana First Circuit Court of Appeal made direct reference to said statements, providing:

> During the investigation, three witnesses, who said that they had been at the club on the night of the murder, gave statements to investigators that

---

[40]*See* Federal rec., doc. 1, petitioner's supporting memorandum at pp. 28-30.

they saw someone other than defendant shoot the victim.  They did not identify the killer nor did they testify at trial.  Additionally, Thomas Williams, whose fiancee was defendant's aunt, told investigators that he shot the victim in self-defense after the victim attacked him with a beer bottle.[41]

The state appellate court also alluded to a possible reason why counsel opted not to place

Williams on the witness stand, informing that officials did not believe Williams's story for

several reasons:

> (1) None of the approximately thirteen people interviewed immediately after the murder mentioned Williams, and Williams did not come forward, claiming self-defense, until the night after the murder; (2) Williams's photograph was one of the twenty-four photographs in the photographic lineup in which Tillison and James identified defendant as the murderer; 3) Detective Bobby Juge, of the St. Tammany Parish Sheriff's Office, testified at trial that, during the initial investigation, officers were told that someone was going to "take the wrap" (sic) for defendant; (4) Defendant's attorney, who worked for No Limit Productions, spoke on the telephone with Williams and then gave Williams's name to investigators; and (5) Defendant and Williams had a relationship based upon Williams's connection with defendant's aunt, and Williams's only source of income came from working as a security guard for defendant.[42]

Based upon the above, along with the strength of the evidence presented

against petitioner at trial, *see* discussion *supra* at pp. 12-13, the court finds that petitioner

has failed to satisfy his burden of showing a reasonable probability that the uncalled

---

[41]*See State v. Phipps*, No. 2002 KA 0890 at p. 3.

[42]*See State v. Phipps*, No. 2002 KA 0890 at pp. 3-4.

witnesses would have made a difference in the result of his proceedings.  Accordingly, petitioner's claim for federal habeas corpus relief is without merit.

Finally, petitioner claims that counsel was ineffective due to his failure to ensure that every bench conference was transcribed, claiming that such conferences, which took place outside the jury's hearing, "involved evidentiary matters" and petitioner had "a state constitutional right to a complete record".[43]

Once again, the fact that petitioner, in connection with his state court proceedings, may have suffered a violation of his state law rights, is of no moment for purposes of attaining federal habeas corpus relief.  *See Jernigan, supra*.  Further, the trial court's evidentiary rulings, which were the alleged subject matter of the untranscribed bench conferences, have been reviewed in connection with the instant opinion and the court has determined that petitioner suffered no due process violation.  Accordingly, petitioner likewise suffered no due process violation by virtue of the fact that not all of the bench conference discussions, which preceded the trial court's evidentiary rulings, were transcribed.

### E.  Prosecution Allowed to Back Strike Juror That Had Already Been Sworn

Petitioner asserts that the first seven jurors were selected and sworn in on September 10, 2001.  One of these first seven jurors was Juror No. 185, Michelle G.

---

[43]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 31.

Pecoraro.  Thereafter, on September 12, 2001, the trial court allowed the prosecution to exercise one of its peremptory challenges and "back strike" Ms. Pecoraro.  Petitioner contends that because Ms. Pecoraro had already been sworn in, allowing the prosecution to exercise a peremptory challenge against her constituted a violation of La.C.Cr.P. art. 795(B)(1) which provides:  "Peremptory challenges shall be exercised prior to the swearing of the jury panel".[44]  The state district court specifically rejected petitioner's claim in connection with his post-conviction application, finding that the peremptory challenge exercised against Ms. Pecoraro was clearly allowed under the provisions of La.C.Cr.P. arts. 790 and 783.[45]

Petitioner, in connection with the instant claim, makes no assertion that he suffered any due process violation as a result of the prosecution's alleged improper exercise of a peremptory challenge nor does this court's review of the pertinent record uncover any such violation.  In the absence of such a violation, petitioner is clearly not entitled to federal habeas corpus relief.

Accordingly;

---

[44]*See* Federal rec., doc. 1, petitioner's supporting memorandum at pp. 36-37.

[45]A copy of the state district court's January 14, 2005 "Reasons for Judgment with Order", pursuant to which the court rejected petitioner's "back strike" claim, is contained in the State rec., vol. 6 of 6.  La.C.Cr.P. art. 790 provides, in pertinent part, that "[w]hen selection of jurors and alternate jurors has been completed ... the jurors shall then be sworn in together...."  La.C.Cr.P.  art. 783 provides, in pertinent part, that "[t]he court may excuse a member of the petit jury venire at any time prior to the time he is sworn as a juror to try a particular case."

### RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, McKinley Phipps, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this __13th__ day of _____December_____, 2007.

LOUIS MOORE, JR.

United States Magistrate Judge

28